IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| KENNETH HARRIOTT | ) | |
| 11003 Waco Drive | ) | |
| Upper Marlboro, MD 20772 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| TONY OJOH | ) | |
| 49909 Haverwood Lane | ) | |
| Suite 3218 | ) | |
| Dallas, TX 75287 | ) | |
| | ) | |
| On behalf of themselves and | ) | |
| all those similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| WASHINGTON METROPOLITAN | ) | |
| AREA TRANSIT AUTHORITY, | ) | |
| 600 5th Street, NW | ) | |
| Washington, DC 20001 | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT**
**(Discriminatory Termination in**
**Violation of Title VII of the Civil Rights Act of 1964)**

COME NOW the Plaintiffs Kenneth Harriott and Tony Ojoh, by and through their attorneys, Webster & Fredrickson, PLLC, for the Complaint in the above-captioned action and states to this Honorable Court as follows:

## INTRODUCTION

1.      This is a civil action brought by Plaintiffs Kenneth Harriott and Tony Ojoh, on behalf of themselves and those similarly situated, against Defendant Washington Metropolitan Area Transit Authority ("WMATA") under the anti-discrimination provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*

2.      Angel Pena, the managing Director of the Office of Quality Assurance, Internal Compliance & Oversight ("QICO"), forced his subordinate managers "to come up with dirt on people so that he could fire them." Pena undertook "an entire laundry list of just plain bad and corrupt business practices" which resulted in the termination of employment of nearly forty employees under Pena's supervision.  Of those, all but two were either black or of foreign national origin (and non-white).  WMATA engaged in systemic discrimination in favor of white employees.

## JURISDICTION

3.      This court has jurisdiction over this matter pursuant to 42 U.S.C. § 2000e-5(f)(3), and 28 U.S.C. § 1331.

4.      Venue is proper under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391 as most of the acts complained of herein occurred in the District of Columbia.

5.      Within 180 days of the discriminatory terminations complained of herein, Plaintiffs filed claims of discrimination with the Equal Employment Opportunity Commission.

6.      On March 29, 2019 and April 3, 2019, the Equal Opportunity Commission issued notices of right to file a civil action for Mr. Harriott and Mr. Ojoh respectively.

7.      Plaintiffs filed the instant action within ninety days of service and ninety days of receipt of the notice of their right to file a civil action.

8.      Eight additional similarly situated former QICO employees have charges of discrimination pending with the Equal Employment Opportunity Commission.

9.      Plaintiff Kenneth Harriott is an adult male African-American resident of the State of Maryland.

10.     Plaintiff Tony Ojoh is an adult male resident of the State of Texas.  Mr. Ojoh is originally from Nigeria.

11.     In addition to Mr. Harriott and Mr. Ojoh, eight additional former QICO employees have claims pending before the EEOC: Mr. Berhe Weldemichael, Quality Mission Assurance Officer; Mr. Lenthe Barber, Jr., Quality Mission Assurance Inspector; Mr. Pradeep Chumble, Quality Mission Assurance Officer; Mr. Louis Rugemintawaza, Quality Mission Assurance Officer; Ms. Sharon Cannon, Quality Mission Assurance Officer; Mr. Ulysses Johnson, Quality Mission Assurance Officer; Ms. Tonia Burrell, Quality Mission Assurance Officer; and Mr. Anthony Ufoh, Quality Assurance Mission Officer.

12.     In addition, Plaintiffs bring this lawsuit on behalf of all others similarly situated: African-American and foreign-born persons of color in QICO terminated under Angel Pena.

13.     Defendant Washington Metropolitan Area Transit Authority ("WMATA"), created effective February 20, 1967, is an interstate compact agency.  WMATA is an employer for the purposes of Title VII.

## FACTS GIVING RISE TO RELIEF

### Pena and WMATA Engage in Systemic Discrimination on the Basis of Race and National Origin

14.     WMATA's QICO is an internal management division that conducts internal reviews of WMATA's operations.  The internal reviews and audits are intended to provide WMATA management with assessments of the state of operations upon which managers can make decisions.

15.     QICO employs approximately 50 Assurance Officers and Assurance Inspectors over 4 divisions.

16.     Approximately half of the QICO Assurance Officers and Assurance Inspectors employed by WMATA in the relevant time period were Caucasian; the other half were African-American or foreign-born persons of color.

17.     QICO Managing Director Angel Pena directly or indirectly through QICO managers like Robin Hahn, Brian Smith, and Hakim Davis, ordered the terminations of nearly forty employees over the course of 2016 to 2018.

18.     Of these terminated employees, nearly every single one was African-American or a foreign-born person of color.

19.     Pena and WMATA did not have legitimate grounds for these terminations, and instead, Pena instructed his subordinate managers "to come up with dirt on people so that he could fire them."

20.     In so doing, Pena undertook "an entire laundry list of just plain bad and corrupt business practices."

21.     Upon information and belief, WMATA's Inspector General found that Pena and Carlos Proctor, the Plaintiffs' Managing Director and Program Manager respectively, engaged in an illegal practice of eliminating jobs and firing employees so that he could hire replacement contractors from his friend's company (HNTB General Manager).

22.     Pena and WMATA's decision to fire these employees, including Plaintiffs, had nothing to do with their performance.

23.     WMATA's treatment of Plaintiffs Harriott and Ojoh, along with others similarly situated, is consistent with Pena's efforts to create dirt on employees to provide a false justification for discriminatory terminations.

### *Pena and WMATA Fire Almost Exclusively Persons of Color*

24.     Indeed, Plaintiffs Harriott and Ojoh, along with Tonia Burrell and Anthony Ufoh all were transferred to QICO from Office of Safety.

25.     From November 2017 to July 2018, Messrs. Harriott, Ojoh, and Ufoh and Ms. Burrell worked in QICO under Pena.

26.     All had track records of success at WMATA.

27.     None had any serious documented performance issues.

### *WMATA Transfers Ken Harriott then Terminates Him with No Legitimate Reason*

28.     Plaintiff Harriott had been employed at WMATA for 17 years at the time of his termination.

29.     Plaintiff Harriott served as a Quality Assurance and Warranty Officer, Acting Quality Assurance Manager, and Safety Assurance Officer during his WMATA tenure.

30.     As of November 2017, Plaintiff Harriott was assigned as a Safety Assurance Lead auditor (in Safety) for FTA, NTSB and Tri-State oversight internal WMATA audits and was a team member of the Internal Safety and Security Review (ISSR) audit group.

31.     On November 20, 2017, Mr. Harriott (along with Tony Ufoh, Tony Ojoh, Tonia Burrell, and Daniel Gebremeskel) was involuntarily transferred from the Office of Safety to the Office of Quality and Internal Compliance.

32.     WMATA management provided no clear explanation for this transfer.

33.     Following the transfer, WMATA management gave Mr. Harriott a series of assignments with short turnaround times, including assignments to write audit plans,

create questionnaires, conduct audits, and complete written reports, convene closing meetings and follow-up verifications.

34.     WMATA denied Mr. Harriott access to QICO databases that other QICO teams used daily to access templates, reference material and other pertinent information.

35.     Despite these, and other impediments placed in his way, Mr. Harriott continued to do excellent work as he had during his career with WMATA.

36.     The reports Mr. Harriott completed were reviewed, and signed off by other QICO employees at QICO downtown offices.

37.     Mr. Harriott did not have any documented performance issues.

38.     Nevertheless, on July 17, 2018, WMATA terminated Mr. Harriott's employment.  The letter of termination did not reference any alleged performance issues and there were none.

39.     WMATA fired Plaintiff Ojoh, Tonia Burrell, and Anthony Ufoh—all African-American or foreign-born persons of color—on the same day.

40.     WMATA did not fire any white employees at that time.

### *Following this Pattern, WMATA Fired Plaintiff Ojoh*

41.     Plaintiff Ojoh's story is very similar to that of Mr. Harriott.

42.     Mr. Ojoh was also transferred from the Safety division to QICO in November 2017.

43.     Mr. Ojoh, like Mr. Harriott, was given assignments with short deadlines and with artificial impediments to completion of those projects.

44.     Nevertheless, Mr. Ojoh continued his excellent work—WMATA used a major audit report that Mr. Ojoh performed and later published Mr. Ojoh's report on its website. WMATA improperly took Mr. Ojoh's name off the report and replaced it with

contractors who did not perform the work.  Yet, the fact that WMATA used the report with little revisions reflects Mr. Ojoh's excellent performance.

45.     WMATA fired Mr. Ojoh on July 17, 2018 without providing any grounds for the termination other than stating that Mr. Ojoh was an at-will employee.

46.     WMATA later claimed it fired Mr. Ojoh for performance reasons, but had not followed its policies concerning performance management.

### *Other African-American and Foreign-Born Persons of Color Also Suffered Discrimination*

47.     The experience of other QICO employees highlights the pattern of discrimination in that department.

48.     For example, at one time, there were eight total QMA/Rolling Stock Assurance Officers. Of those eight, six were either African-American or foreign-born persons of color. Two were white.

49.     All African-American or foreign-born Officers completed their tasks independently. Five out of six were fired and those terminations were based on pretextual reasons; the other African-American was written was up.

50.     One white Officer (Michael Davis) was assigned very little work. The second white Officer (Phil Grove) was assigned to a single 2017 project, and his project was completed by private contractors. Both Davis and Grove have been retained.

51.     All five African-American or foreign-born Officers that were terminated were qualified to perform the job based on their education backgrounds and experience.

52.     Both of the white Officers that were retained either did not have the requisite educational background or did not have proper Quality Assurance experience.

53.     There were nine total QMA/Rolling Stock Assurance Inspectors.  Of those nine, four were African-American or foreign-born persons of color, and five were white: Out of the four African-American or foreign-born Inspectors: One was fired (Lenthe Barber, Jr); two were written up and forced to retire (Jesus Sandoval and Garrett Harper) one (Alemu Marde) was forced to move to another department. All five of the white Inspectors were retained.  Two were even promoted to Quality Assurance Officer, replacing these African-American and foreign-born persons of color.  The two African-American or non-American Officers Rolling Stock Assurance Inspectors that were fired or forced to retire were the most experienced inspectors in WMATA.  QICO had previously fired Ulysses Johnson and Sharon Cannon, two other African-American WMATA QMA/Rolling Stock Assurance Officers fired by WMATA in late April 2017. Discrimination explains why the vast majority of those fired were non-white or foreign-born.

### *WMATA Did Not Have Legitimate Reasons to Fire Other African-American and Foreign-Born Employees*

54.     As with Mr. Harriott and Mr. Ojoh, WMATA claimed that each of these other employees, Mr. Weldemichael, Mr. Barber, Mr. Chumble, Mr. Louis Rugemintawaza, Ms. Cannon, Mr. Johnson, Ms. Burrell, and Mr. Ufoh, had performance issues justifying termination.

55.     Rather than legitimately evaluate these QICO employees, WMATA, through Pena and QICO managers Robin Hahn and Brian Smith, created fabricated or falsified reasons to justify termination for each, sometimes out of whole cloth.

*Mr. Weldemichael, Mr. Barber, Mr. Chumble, and Mr. Rugemintwaza*

56.     Mr. Weldemichael, Mr. Barber, Mr. Chumble, and Mr. Rugemintwaza each

had excellent performance evaluation reviews in past years (12 years, 3 years, 16 years & 12 years respectively) in their respective positions within WMATA.  Mr. Weldemichael, Mr. Barber, Mr. Chumble and Mr. Rugemintwaza were "Role Model" or "Competent" employees every year they were QMA/Rolling Stock Assurance Officers or Inspectors. All hold bachelor degrees (Engineering), relevant QA Audit/Inspection Certifications, and fifteen-to-twenty years of Quality Assurance experience.

57.     WMATA's strategy for terminating these employees followed a pattern: WMATA would create a paper trail that seemed to provide plausible justifications for firing these employees, but when examined, those explanations prove to be false.

58.     WMATA management would write up employees for not completing tasks that were not assigned to them, criticize them for incomplete tasks from a decade earlier that were not their responsibility, and set them up to fail by assigning them tasks that were impossible to complete within the given deadlines—and which were not even continued after firing these QICO.  At the same time, WMATA routinely ignored WMATA policies when downgrading already-issued performance evaluations.

59.     For example, Mr. Weldemichael signed off on his performance evaluation in March 2017, as did his supervisor.  In violation of WMATA procedures, WMATA management then asked Mr. Weldemichael to sign another performance evaluation covering the same time period.

60.     This new performance evaluation reflected downgraded performance. WMATA management downgraded Mr. Weldemichael's evaluation, despite the fact that the same manager who had repeatedly and in writing praised Mr. Weldemichael's performance on the very tasks WMATA management now criticized.

61.    Mr. Barber and Mr. Chumble had similar experiences—their excellent performance for 2016 were changed to reflect poorer performance.  In each case, these downgraded evaluations were submitted to Human Resources as justification for termination.

62.    WMATA management criticized both Mr. Weldemichael and Mr. Chumble for their performance on the RTRA Supervisor Audit. Mr. Weldemichael and Mr. Chumble were called in to fix the audit that was the manager's responsibility.   Mr. Weldemichael and Mr. Chumble did so and completed their task on time.  Yet, both were still criticized for their work on the project when the delays and errors were not their doing.

63.    WMATA claimed that Mr. Chumble and Mr. Barber had "open" audits from years past.  The implication by WMATA management was that Mr. Chumble and Mr. Barber were somehow to blame for the lack of closure for these audits.  In fact, corrective action plans by the auditees needed to be put in place before the audits were closed.  The implementation of corrective action plans was outside the control of Mr. Chumble or Mr. Barber and did not reflect on their performance at all.  In fact, in years past both Mr. Chumble and Mr. Barber received "Exceed Expectations" performance evaluations related to these very tasks.

64.    WMATA management claimed that Mr. Weldemichael, Mr. Barber and Mr. Chumble each failed to record or log a sufficient number of audits or inspections.  Yet, in each case, these employees' work circumstances had changed such that each no longer was responsible for conducting the particular audits or inspections at issue.

65.    In contrast to WMATA's treatment of white and American-born counterparts, WMATA management required that each of the Quality Assurance Officer

Complainants create stand-alone "quality program plans" in short order. "Program plans" are developed alongside a program management plan (PMP).

66.     If there is no project management plan, it is impossible to develop a stand-alone Program Plan.  This is why the QICO department had never created program plans for ongoing operations and had no template to do so.

67.     When the employees sought assistance from WMATA management, none was forthcoming.  And after the termination of these employees in July 2017, WMATA discontinued all work on these stand-alone program plans and continued operations as before.

68.     WMATA assigned these difficult projects for the sole purpose of setting up these African-American and foreign-born persons of color to fail.

*Sharon Cannon and Ulysses Johnson*

69.     WMATA's terminations of Sharon Cannon and Ulysses Johnson in April 2017 followed the same pattern.

70.     Ms. Cannon joined WMATA as a Quality Assurance Officer in 2013.   In 2015, Ms. Cannon earned "Role Model" performance evaluations.

71.     She continued her excellent work in 2016 and submitted a self-evaluation to that effect.  Despite having never been counseled during the year, and no concerns about her performance raised, WMATA management gave Ms. Cannon a "needs improvement" evaluation.  In that evaluation, WMATA management falsely criticized Ms. Cannon for not completing tasks that were never assigned to her.

72.     WMATA then fired Ms. Cannon on April 24, 2017.  No one provided any explanation in the meeting beyond stating Ms. Cannon was an at-will employee.  Yet, when Ms. Cannon applied for unemployment insurance, WMATA falsely claimed she had

engaged in misconduct despite having never intimated that this was the case (and in fact there was no misconduct).

73.     WMATA took a similar tack with Ulysses Johnson.  Mr. Johnson worked in the transportation field for nearly three decades and joined WMATA in 2008.  In 2013, Mr. Johnson accepted a promotion to the Quality Assurance and Warranty Department (QAAW) where he was assigned to the Car Track Equipment Maintenance Department (CTEM). In that role, Mr. Johnson was responsible for new equipment acceptance and traveled to different vendors.

74.     In 2016, management changed the focus of Mr. Johnson's job.  In February 2016, the new Managing Director of Quality stated that there would be a new focus on high level audits.

75.     In September 2016, WMATA management stated to Mr. Johnson and others in a staff meeting that all other projects would be on hold and that staff was to focus on the Passenger Skills Assessment Audits ("PSA's").  The PSA's were confidential assessments that monitor the operator's performance on a particular route. Coinciding with the PSA project, Mr. Johnson's group was assigned to conduct a Station Manager Assessment Audit. The Station Manager audit was completed in December 2016 and the PSA's were on-going.  All indications were that management was pleased with the work.

76.     However, when it came time to fill out performance evaluations, WMATA management criticized Mr. Johnson for not completing tasks that Mr. Johnson's manager herself put on hold in favor of the special assignments.

77.     Then, after failing to allow Mr. Johnson any process for review of the evaluation, and without ever placing Mr. Johnson on a performance improvement plan

per WMATA's policies and practice, WMATA fired Mr. Johnson.  The only explanation provided was that Mr. Johnson was an "at-will" employee.

## COUNT I
### (Discrimination on the Basis of Race in Violation of the Civil Rights Act of 1964, as amended.)

78.    Plaintiffs incorporate by reference and re-allege each of the allegations contained in paragraphs 1-77 of this Complaint with the same force and vigor as if set out here in full.

79.    Plaintiffs, and all those similarly situated, were fired by Defendant WMATA because of their race and/or national origin in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*

80.    As a direct and proximate result of the unlawful acts of Defendant WMATA Plaintiffs suffered and continue to suffer lost earnings and benefits, pain, suffering, humiliation and mental distress.

*              *                  *

WHEREFORE, the premises considered, Plaintiffs respectfully prays that this Honorable Court:

1.    Enter judgment on Plaintiffs' behalf against Defendant;

2.    Award Plaintiffs compensatory damages, and other damages;

3.    Instate Plaintiffs to the positions held prior to their unlawful terminations or other equivalent positions;

4.    Award Plaintiffs all lost pay;

5.    Award Plaintiffs their court costs, expenses, attorneys' fees, prejudgment interest and post-judgment interest;

6.     Declare that Defendant's conduct is in violation of Title VII of the Civil Rights Act of 1964, as amended; and

7.     Grant such other relief as this Court deems just and proper.

Respectfully submitted,

WEBSTER& FREDRICKSON, PLLC

*/s/ Geoffrey H. Simpson*
Bruce A. Fredrickson, # 933044
Cedar P. Carlton, # 480255
Geoffrey H. Simpson, # 988437
1775 K Street, NW
Suite 600
Washington, DC 20006
Counsel for the Plaintiff

## JURY DEMAND

Plaintiff demands a trial by jury on all issues contained herein.